# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **PROJECT ON GOVERNMENT OVERSIGHT, INC.** <br> 1100 13th Street, NW <br> Suite 800 <br> Washington, DC 20005, <br><br> **Plaintiff,** <br><br> v. <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY** <br> 245 Murray Lane, S.W. <br> Washington, DC 20528 <br><br> **Defendant.** | **Civil Action No.** |

## COMPLAINT

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 220 and 2202, for injunctive, declaratory, and other appropriate relief. Plaintiff Project On Government Oversight, Inc. ("POGO") challenges the failure of the U.S. Customs and Border Protection ("CBP"), a subcomponent of defendant U.S. Department of Homeland Security ("DHS"), to provide POGO with all non-exempt documents responsive to three FOIA requests POGO filed with CBP seeking documents related to CBP's use of force.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

4. Plaintiff POGO is a nonpartisan independent organization based in Washington, D.C. and organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles. POGO's investigators and journalists take leads and information from insiders and verify the information through investigations using FOIA, interviews, and other fact-finding strategies. POGO's investigative work has been recognized by Members of Congress, executive branch officials, and professional journalism organizations. For instance, in 2015, POGO won the Robert D.G. Lewis Watchdog Award, the Society of Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, for reporting on the Department of Justice's opaque system for handling allegations of attorney misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing Business Editing & Writing for its investigative series scrutinizing the government's oversight of offshore drilling. POGO extensively used records obtained under FOIA for this investigation.

5. DHS and its subcomponent CBP are a federal agency within the meaning of FOIA, 5 U.S.C. § 552(f), and have possession and control of the records POGO seeks in this action.

## STATUTORY BACKGROUND

6. FOIA requires federal agencies, upon request, to make records "promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless one or more specific statutory exemptions apply.

7. The agency must provide the public records when they are requested in order "to ensure an informed citizenry, vital to the functioning democratic society." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

8. An agency must make a determination on a FOIA request within twenty business days and notify the requester of which of the requested records it will release, which it will withhold and why, and the requester's right to appeal the determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

9. The twenty-day deadline for an agency to make a determination on a request begins on the earlier of: (l) the date "the request is first received by the appropriate component of the agency" or (2) "ten days after the request is "first received by any component of the agency that is designated in the agency's regulations . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(ii).

10. In unusual circumstances, an agency may extend the time limits the FOIA prescribes by written notice to the person making such request that sets forth the reasons for such extension and the date on which a determination is "expected" to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B)(i).

11. If an agency does not respond to a FOIA request by the statutory deadline, the requester is deemed to have exhausted administrative remedies and may immediately pursue judicial review. 5 U.S.C. §§ 552(a)(6)(C)(i), 552(a)(4)(B).

**FACTUAL BACKGROUND**

12. The CBP Use of Force Policy Handbook (available at https://www.cbp.gov/siges/default/files/assets/documents/2021-Jul/cbp-use-of-force-policy_4500-002A.pdf) states

that "a respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties." The CBP Use of Force Handbook directs CBP to document and investigate the agency's use of force. *Id.*

13. Notwithstanding this policy, on May 23, 2018, U.S. Border Patrol Agent Romualdo Barrera shot and killed Claudia Patricia Gómez González while she was walking through Rio Bravo, Texas with a group of other migrants.

14. Following the killing of Ms. Gómez González CBP released a statement claiming Agent Barrera was attacked by the group with "blunt objects." Two days after the shooting, CBP issued another statement claiming that the group had rushed the agent but made no mention of an attack or of blunt objects. Marta Martinez, a witness to the shooting, went live on Facebook and later publicly disputed the statement, saying that she did not see any weapons or hear the agents before shots were fired.

15. The FBI opened a criminal investigation into the incident that was overseen by the Criminal Section of the U.S. Department of Justice's Civil Rights Division in coordination with the Criminal Division of the U.S. Attorney's Office for the Southern District of Texas. In a separate civil lawsuit brought by the family of Ms. Gómez González against Agent Barrera the court advised the parties on July 2, 2021, that the criminal investigation "has concluded, and the United States does not anticipate taking further action in the criminal matter." *Vicente, et al. v. Barrera*, Civil No. 20-cv-00081 (S.D. Tex. Laredo Div.) (ECF No. 48).

16. In a previous incident on May 28, 2010, a group of U.S. Border Patrol Agents intercepted Anastasio Hernández Rojas while he was attempting to cross the U.S.-Mexican border into the United States. Initially, Border Patrol agents brought Hernández Rojas to a

detention facility at which he alleged he was assaulted by an agent.

17.     Sometime later, Border Patrol Agent Gabriel Ducoing and CBP agent Philip Krasielwicz transported Hernández Rojas to an area of the San Ysidro Port of Entry called "Whiskey 2" for his removal to Mexico. After exiting the transport vehicle, the agents removed the handcuffs from Hernández Rojas. A struggle ensued between Hernández Rojas and the two agents. Two Immigration and Customs Enforcement ("ICE") officers, Andre Piligrino and Harinzo Narainesingh, arrived at the scene.

18.     Accounts differ about what transpired after this point, as set forth in statements made by the U.S. Department of Justice ("DOJ") in a 2015 press release and by the Inter-American Commission on Human Rights ("IACHR") in a complaint (available at https://d3n8a8pro7vhmx.cloudfront.net/alliancesandiego/legacy_url/1324/Anastasio-Complaint-FINAL-160329.pdf?1490744367).

19.     Both agree that agents struck Hernández Rojas with their batons during the struggle. But they differ on what happened next.

20.     Agents Ducoing and Krasielwicz maintained that Hernández Rojas never punched any agent. By contrast, ICE Agents Piligrino and Narainesingh claimed that Hernández Rojas punched all four agents. The complaint brought by IACHR documents testimony that the four agents and Hernández Rojas fell to the ground. At this point the agents placed Hernández Rojas in handcuffs.

21.     Accounts also differ as to what happened once Hernández Rojas was handcuffed. DOJ claims Hernández Rojas kicked agents, but its account of the incident omits any mention of any individual falling to the ground at any stage of the altercation. DOJ's account also omits any claim that Hernández Rojas punched an agent.

22. Both accounts claim that during the struggle three additional CBP agents arrived on the scene and attempted to return Hernández Rojas to the transport vehicle, but that Hernández Rojas resisted being placed in the vehicle. According to DOJ, Hernández Rojas then attempted to kick the agents, while IACHR claims Hernández Rojas merely braced his feet against the door of the vehicle.

23. After agents failed to secure Hernández Rojas in the transport vehicle additional agents responded to the scene. According to the IAHCR, agents placed Hernández Rojas face-down on the pavement and, as alleged by witnesses, agents knelt on his back while punching, kicking, and stepping on his body and head.

24. Witnesses also alleged that additional vehicles arrived on the scene and one of the newly arrived agents kicked Hernández Rojas while he was still lying handcuffed on the pavement. Video recordings by witnesses reveal that CBP Agent Jerry Vales tased Hernández Rojas. DOJ corroborated the claim that an agent used a taser to shock Hernández Rojas but omitted any specifics or the name of the officer involved. According to the IAHCR's complaint, the taser's log revealed that Agent Vales administered the taser four times, successfully making contact with Hernández Rojas twice. A witness confirmed that agents repeatedly punched Hernández Rojas in the ribs after Agent Vales activated the taser.

25. A video of the scene shows Hernández Rojas face-down on the pavement at this point, with an agent kneeling on his head and neck. According to the video, officers then removed Hernández Rojas's pants. The account by DOJ differs significantly. According to DOJ, agents restrained Hernández Rojas's legs only after he stopped resisting.

26. Both accounts agree that Hernández Rojas was motionless while agents performed CPR on him. An ambulance arrived on the scene and transported Hernández Rojas to

15

Sharp Chula Vista Hospital where he died three days later on May 31, 2010.

27. Two autopsies of Hernández Rojas—one performed by Dr. Glenn N. Wagner of the San Diego County Office of the Medical Examiner and one performed by Dr. Marvin Pietruszka, the medical expert for the plaintiffs in the civil suit—ruled the immediate cause of death as anoxic encephalopathy, which is brain damage by lack of oxygen to the brain. Both autopsies also ruled the death a homicide.

28. DOJ's press release of November 6, 2015, however claimed that according to the medical examiner Hernández Rojas "would not have died had there not been methamphetamine intoxication." The IAHCR labelled this claim "erroneous."

*Plaintiff's June 21, 2022 FOIA Request*

29. On June 21, 2022, POGO submitted by email to the CBP a FOIA request for records related to CBP's investigation into Ms. Gómez González' death. Specifically, POGO requested five categories of records:

> (1) Any and all documents collected or prepared by the U.S. Border Patrol's critical incident team related to the May 23, 2018 shooting death of Claudia Patricia Gómez González by a U.S. Border Patrol agent.
>
> (2) The U.S. Customs and Border Protection (CBP) Office of Professional Responsibility (OPR) Report of Investigation (ROI) and any and all associated documents regarding the May 23, 2018 shooting death of a use of force incident where shot and killed Claudia Patricia Gómez González by U.S. Border Patrol Agent Romualdo Barrera, including, but not limited to: (a) The criminal ROI related to this incident; (b) The administrative ROI related to this incident; (c) Any and all documentation related to the crime scene investigation, whether carried out by U.S. Border Patrol, CBP' Laboratories and Scientific Services, or any other federal entity; (d) Any and all recommendations for disciplinary action submitted to CBP HRM related to this incident.
>
> (3) The Immigration and Customs Enforcement (ICE) Office of Professional Responsibility's (OPR) ROI submitted to CBP HRM resulting from a use of force incident where U.S. Border Patrol Agent Romualdo Barrera shot and killed Claudia Patricia Gómez González on May 23, 2018, including, but not limited to, any and all recommendations for disciplinary action that ICE OPR submitted to CBP HRM related to this incident.

16

(4) DHS Office of Inspector General ROI submitted to CBP HRM resulting from a use of force incident where Border Patrol Agent Romualdo Barrera shot and killed Claudia Patricia Gómez González on May 23 2018, including any and all recommendations for disciplinary action that DHS Office of Inspector General submitted to CBP HRM related to this incident.

(5) All documentation of HRM Disciplinary Review Board's (DRB) recommendation for discipline for the use of force incident where U.S. Border Patrol Agent Romualdo Barrera shot and killed Claudia Patricia Gómez González on May 23, 2018. This should include, but not be limited to, any records or documentation of downward departure between HRM DRB's initial recommendation and the final disciplinary decision regarding Romualdo Barrera's use of force on May 23, 2018.

30. POGO also requested a waiver of fees explaining that the information in the requested records is of great public concern given the multiple national and international publications that have published articles discussing the shocking details of Ms. Gómez González' death. Therefore, POGO explained, disclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of POGO. POGO further explained how it has the capacity, intent, and demonstrated ability to disseminate the requested information to a broad cross-section of the public.

31. POGO further requested that it not be charged search or review fees because it qualifies as a member of the news media. POGO explained that it routinely and systematically disseminates information to thousands of concerned citizens, policymakers, and the media via its website and through its joint publication of stories in other publications.

32. On June 27, 2022, CBP advised POGO that a search for records had revealed that any responsive records currently are part of an open and pending investigation and therefore were being withheld in their entirety pursuant to FOIA Exemption 7(A). CBP further stated that because of the ongoing investigation it was unable to provide POGO with an estimated number

of responsive pages.

33. On September 9, 2022, POGO filed an administrative appeal of CBP's denial of its request for records related to the investigation of the death of Claudia Gómez González. As POGO's appeal explained, CBP had failed to meet its burden of demonstrating that withholding all responsive records pursuant to Exemption 7(A) is proper. First, CBP failed to identify the nature of the purported open and pending investigation. Given the acknowledgment by the district court in *Gomez Vicente v. United States* that DOJ had concluded its investigation and did not anticipate taking further action in the criminal matter, it is unclear what, if any, investigation is still pending.

34. Second, CBP failed to satisfy the three-part process for categorically withholding records under Exemption 7(A) as set forth by the U.S. Court of Appeals for the District of Columbia in *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1098 (D.C. Cir. 2014). That test requires the withholding agency to (1) "define the categories functionally"; (2) "conduct a document-by-document review"; and (3) "explain . . . how the release of each category would interfere with enforcement proceedings." *Id.* at 1098 (quotation omitted).

35. By letter dated September 30, 2022, CBP advised POGO that the open and pending investigation is not related to CBP's law enforcement functions but instead involves an open agency investigation into its own personnel. CBP agreed with POGO, however, that its FOIA Division "could not possibly have determined whether the records may reasonably be expected to cause some articulable harm to that investigation." According to CBP, the FOIA Division failed to provide reasonably segregable portions of the requested records, nor did it satisfy its duty to limit its withholdings to only that information in which it "reasonably foresees that disclosure would harm an interest protected by an exemption."

36.     CBP further noted that the FOIA Division had failed to conduct a complete search because it failed to obtain a response from Human Resources Management to POGO's request for categories of records from that office. Accordingly, CBP remanded POGO's request to the FOIA Division for processing.

37.     By email dated March 23, 2023, POGO requested the status of its FOIA request given the remand to the FOIA Division on September 30, 2022. To date, POGO has received no response to its inquiry nor has it received any records from CBP in response to its FOIA request.

38.     Under 5 U.S.C. § 552(a)(6)(C)(i), POGO has now effectively exhausted all applicable administrative remedies with respect to its June 21, 2022 request.

*Plaintiff's July 25, 2022 FOIA Request*

39.     On July 25, 2022, POGO submitted through the FOIAOnline Portal to the CBP a FOIA request for records related to the assault on and killing of Anastasio Hernández Rojas. Specifically, POGO requested five categories of records:

> (1) Any and all documents collected or prepared by the U.S. Border Patrol's critical incident team related to the May 28, 2010, detainment and May 31, 2010, death.
>
> (2) The Report of Investigation (ROI) and any and all associated documents that the U.S. Customs and Border Protection (CBP) Office of Professional Responsibility (OPR) (formerly known as CBP Internal Affairs) submitted to CBP Human Resource Management (HRM) regarding the May 28, 2010, use of force incident following which Hernández Rojas died, including, but not limited to: (a) The criminal ROI related to this incident; (b) The administrative ROI related to this incident; (c)Any and all documentation related to the crime scene investigation, whether carried out by U.S. Border Patrol, CBP' Laboratories and Scientific Services, or any other entity; (d) Any and all recommendations for disciplinary action submitted to CBP Human Resource Management (HRM) related to this incident.
>
> (3) The Immigration and Customs Enforcement (ICE) Office of Professional Responsibility's (OPR) ROI submitted to CBP HRM resulting from the use of force on Anastasio Hernández Rojas on May 28, 2010, including, but not limited to, any and all recommendations for disciplinary action that ICE OPR submitted to CBP HRM related to this incident.

19

(4) DHS Office of Inspector General ROI submitted to CBP HRM resulting from the use of force incident involving Anastasio Hernández Rojas on May 28, 2010, including any and all recommendations for disciplinary action submitted to CBP HRM related to this incident.

(5) All documentation of HRM Disciplinary Review Board's (DRB) recommendation for discipline for the use of force incident where CBP agents used force against Hernández Rojas on May 28, 2010. This should include, but not be limited to, any records or documentation of downward departure between HRM DRB's initial recommendation and the final disciplinary decision regarding the agents involved in the use of force on Anastasio Hernández Rojas on May 28, 2010.

40.     POGO also requested a waiver of fees explaining that the information in the requested records is of great public concern given the magnitude of the incident, the volume of media reporting on the incident, and the loss of life. POGO explained that it is in the public interest to know whether CBP's actions during the incidents and the subsequent investigation reflect the agency's stated commitment in its Use of Force Policy Handbook to respect human life. POGO further noted that the public deserves full transparency regarding what transpired on May 28, 2010, and the internal investigation that followed.

41.     POGO explained that disclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of POGO. POGO further demonstrated how it has the capacity, intent, and demonstrated ability to disseminate the requested information to a broad cross-section of the public.

42.     POGO also requested that it not be charged search or review fees because it qualifies as a member of the news media. POGO explained that it routinely and systematically disseminates information to thousands of concerned citizens, policymakers, and the media via its website and through its joint publication of stories in other publications.

43.     By email dated July 26, 2022, CBP acknowledged receipt of POGO's FOIA

20

request. On that same day CBP separately advised POGO that its request for a fee waiver was not applicable as the request is not billable.

44. By letter dated September 16, 2022, CBP advised POGO that a search of CBP databases produced records responsive to POGO's request. CBP further advised it was releasing in part five pages, and withholding portions pursuant to FOIA Exemptions 6, 7(C), and 7(E). CBP also noted that component offices had indicated additional responsive documents may be found at DHS's Office of Inspector General and ICE, for which POGO could file separate FOIA requests.

45. On December 13, 2022, POGO filed an administrative appeal arguing that contrary to its obligations under the FOIA, CBP had failed to identify the volume of documents it withheld in full. As POGO explained, information in the public domain makes it clear that the five pages identified and released by CBP cannot possibly be the entire body of responsive records.

46. POGO's appeal also challenged CBP's reliance on Exemptions 6 and 7(C) to withhold records. As POGO outlined in its appeal, there is a wealth of information in the investigative files POGO seeks that already is in the public domain. As examples, POGO cited the names of the Border Patrol agents involved in the incident, the names of family members and witnesses, and much of the content that these individuals said to investigators. POGO further noted that because Mr. Hernández Rojas is deceased and his family members have made detailed information from the investigative file public in their civil suit, there is a greatly reduced privacy interest.

47. POGO further explained that any remaining privacy concerns are outweighed by the public's interest in the requested documents.

48. In its appeal, POGO also challenged CBP's blanket reliance on Exemption 7(E) to withhold responsive documents. As POGO noted, given what information already has been made public, including official disclosures by the government, not everything within the investigative file could legitimately fall within Exemption 7(E). Further, the identities of Border Patrol agents would not constitute a technique or procedure protected by the exemption. POGO also explained that Exemption 7(E) does not protect those techniques and procedures known to the public.

49. By email dated February 22, 2023, POGO inquired about the status of its appeal. CBP responded by email of that date that it expected to have a determination by the end of the following week.

50. To date, POGO has received no decision from CBP on its appeal nor has it received any additional records from CBP in response to its FOIA request.

51. Under 5 U.S.C. § 552(a)(6)(C)(i), POGO has now effectively exhausted all applicable administrative remedies with respect to its July 25, 2022 request.

*Plaintiff's September 30, 2022 FOIA Request*

52. On September 30, 2022, POGO submitted a FOIA request by email to CBP for all versions of CBP's Use of Force Incident Guide in effect from January 1, 2015 until the present.

53. By way of background POGO's request explained that CBP Directive No. 4510-038, Response to Use of Force Incidents, references a March 2015 "Use of Force Incident Guide," and states that Use of Force Incident Teams "will conduct a thorough, factual, and objective investigation, consistent with the Use of Force Incident Guide, as well as prepare a comprehensive report memorializing investigative results." Further, an August 24, 2020 report by the DHS Inspector General states that "CBP's Use of Force Incident Guide includes

22

procedures for investigating use of force incidents."

54. POGO also requested a waiver of fees explaining that the subject matter of its request is of great public concern given the multiple public reports of CBP's failure to adequately investigate use of force by its employees and its concealing of evidence of wrongdoing by CBP employees. As POGO noted, the subject of the request concerns the operations of the federal government, and the disclosures likely will contribute to a better understanding of relevant government procedures by POGO and the general public in a significant way.

55. POGO further noted that the request solely was for non-commercial purposes and that POGO intended to analyze the information responsive to its request and share its analysis with the public.

56. POGO also requested that it not be charged search or review fees because it qualifies as a member of the news media. POGO explained that it routinely and systematically disseminates information to thousands of concerned citizens, policymakers, and the media via its website. POGO also disseminates information directly to supporters, nonprofit organizations, Congress, Executive Branch officials, and other policymakers via direct email, reports, and newsletters.

57. By email dated September 30, 2022, CBP acknowledged receipt of POGO's request. By email dated October 3, 2022, CBP advised POGO that it was granting the request for a fee waiver. By subsequent email dated November 8, 2022, CBP advised POGO that CBP had changed the tracking number for its request, which CBP explained normally is due to the request being transferred to another agency.

58. To date, POGO has received no further communication from CBP nor has it

received any records from CBP in response to its FOIA request.

59. Under 5 U.S.C. § 552(a)(6)(C)(i), POGO has now effectively exhausted all applicable administrative remedies with respect to its September 30, 2022 request.

**PLAINTIFF'S CLAIM FOR RELIEF**
**(Wrongful Withholding of Non-Exempt Records)**

60. Plaintiff repeats and re-alleges paragraphs 1-59.

61. Plaintiff properly asked for records within the custody and control of the U.S. Department of Homeland Security and its subcomponent CBP.

62. Defendant DHS wrongfully withheld agency records requested by Plaintiff by failing to comply with the statutory time limit for making a determination on Plaintiff's FOIA requests and on its appeals, and by withholding from disclosure records responsive to Plaintiff's requests of DHS and its subcomponent CBP.

63. Plaintiff POGO is therefore entitled to injunctive and declaratory relief with respect to the immediate processing and disclosure of the records requested in its June 21, 2022, July 25, 2022, and September 30, 2022 FOIA requests.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Order Defendant to immediately and fully process plaintiff's June 21, 2022, July 25, 2022, and September 30, 2022 FOIA requests and to disclose all non-exempt documents immediately and at no cost to Plaintiff;

(2) Issue a declaration that Plaintiff is entitled to the immediate and expedited processing and disclosure of the requested records at no cost to Plaintiff;

(3) Provide for expeditious proceedings in this action;

(4) Retain jurisdiction of this action to ensure no agency records are wrongfully

withheld;

    (5)    Award Plaintiff its costs and reasonable attorneys' fees in this action; and

    (6)    Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Anne L. Weismann*
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, D.C. 20015
(301) 717-6610
weismann.anne@gmail.com

Dated: August 10, 2023    *Attorney for Plaintiff*